## EDWARDS v. ALECHMAN.

Circuit Court, Dade County.

May 7, 1951.

Joseph A. Wanick and Herman M. Berk, both of Miami Beach, for plaintiff.

Sidney Robbins, Miami, for defendant.

VINCENT C. GIBLIN, Circuit Judge.

The defendant, Abraham Alechman, on December 27, 1950, sold to the plaintiff, George M. Edwards, for an agreed price of $12,500, an "undivided one-half interest" in certain assets of a business in which Alechman was then engaged under the trade name of AA Porter Service. The business was one in which Alechman furnished to various customers or patrons porter or janitor service, rug cleaning service and window and

chimney cleaning service. The sole assets of the business, aside from the registered trade name and good will, were equipment and supplies (such as two small trucks, vacuum cleaners, waxing machines, ladders, waxes and polishes), and the "contracts" with the customers or patrons. The major asset was the "contracts."

In the written agreement by which the sale was evidenced Alechman warranted that "the present *contracts* of said business have a book value of not less than three thousand, one hundred dollars ($3,100) per month, all in good and current and bona fide accounts." The seller further warranted "these accounts for a period of sixty days from the date of this agreement." The evident meaning of the language used was that the seller warranted that he had entered into "contracts" with various customers or patrons by which they were contractually obligated to avail themselves of services supplied by Alechman and to pay therefor (in the aggregate) not less than $3,100 a month for a minimum period of sixty days.

The seller further agreed to "make immediately available to the buyer for his inspection" and to "keep at the office of the business all the books, papers, records and *contracts* of AA Porter Service."

On the execution of the agreement $2,500 of the $12,500 purchase price was paid to Alechman in cash; and Edwards gave him a bank check for $5,000 drawn by a third party on a New Jersey bank. To evidence his indebtedness to Alechman for the deferred balance of $5,000 Edwards executed and delivered two promissory notes.

After the agreement had been signed Edwards made repeated requests that "the books, papers, records and contracts" be placed in the office and made available to him. No books of account were ever shown him. Not even at the trial of this suit were any produced. The only financial "record" exhibited to Edwards or produced at the trial was a copy of a statement submitted by Alechman's accountant to a bank in support of an application for a loan. The statement contained a balance sheet "as at September 30, 1950" (three months before the execution of the agreement) and an "analysis of *estimated* monthly income." The statement, as the accountant's letter to the bank shows, was based on *"information* and books as submitted to me [by Alechman] without verification of the

accounts." No profit and loss statement or other data reflecting operational results during any period was included. The statement, however, serves the purpose of showing that the physical assets of the business were of small value. The *book value* (or *cost*) of the "cleaning machinery and equipment" and the trucks, as depreciated, "as at September 30, 1950," was $6,183; but one of the trucks was encumbered (by a retain title contract or chattel mortgage) to secure an indebtedness of $1,127.25. The net *book value* of the cleaning machinery, equipment and trucks "as at September 30, 1950", was $5,055.75 (one-half of which is only $2,527.87). It is obvious, therefore, that the major asset was the "contracts", which Edwards was led to believe were in existence and were producing a monthly income of $3,100. It is inconceivable that he would have agreed to pay $12,500 for a half interest in the assets of the business had he not relied on Alechman's assurance as to the existence of the "contracts" and their financial productivity.

The evidence discloses that only one customer or patron (the Keyes Company) had entered into a contract. The other customers or patrons (so far as the evidence reveals) were under no contractual obligation whatever and were at liberty to discontinue legally at any time the service supplied them. All that Edwards received or saw in response to his demands for the production of the "contracts" was a list of the names of the customers or patrons to whom service purportedly was being furnished and a schedule *"as at September 30, 1950"* of the monthly amounts they were purportedly paying. There is no disclosure in the evidence of all the names or the total number of the customers or patrons to whom Alechman was supplying service on December 27, 1950 (the date the agreement was signed) or at any subsequent time; and no disclosure as to the monthly income realized from the supplying of service to customers or patrons during the month of December, 1950, or during any subsequent month.

The failure of Alechman to produce "the books, papers, records and contracts" quickly aroused the suspicions of Edwards. A fortuitous circumstance had precluded the receipt by Alechman of the $5,000 for which the check (which Edwards had delivered at the time the agreement was signed) was drawn. The local bank to which it had been presented required a verification of the signature of a corporate endorser. Before the requirement had been met and the check honored

Edwards' suspicion had led him to an effort to extricate himself from the situation into which his execution of the agreement had placed him. He caused the drawer of the check to "stop payment". He promptly demanded the return of the $2,500 cash payment and of the promissory notes he had executed and delivered. Only a week or ten days had elapsed after the signing of the agreement when the demand was made.

The corporation, to the formation of which the parties had agreed and to which they had agreed to transfer the assets of the business, has never been organized. The relationship between the parties is in effect that of partners; and the issuance of a corporate charter would constitute no impediment to rescission of the agreement of December 27, 1950, and the restoration of the status which existed immediately prior to the execution of the agreement.

Having carefully considered the pleadings, the evidence and the arguments of counsel, I find that the equities are with the plaintiff, and that he is entitled to a rescission of the agreement entered into by the parties on December 27, 1950.

The agreement of December 27, 1950 is accordingly cancelled and terminated. The defendant is required and commanded to return forthwith to the plaintiff the sum of $2,500 which the plaintiff paid in cash to the defendant pursuant to the terms of the agreement. The defendant is further required and commanded to return, or cause to be returned, forthwith to the plaintiff the bank check for $5,000 and the two promissory notes (one for $2,000 and the other for $3,000) which the plaintiff delivered to the defendant's attorney at the time of the execution of the agreement. The defendant is required and commanded to pay the costs of this suit. The court retains jurisdiction of the cause and of the parties, but for the sole purpose of enforcing and effectuating the provisions of this final decree.